IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RIDESHARE DISPLAYS, INC.,            )
                                      )
Plaintiff,                            )
                                      )
v.                                    )      C.A. No. 20-cv-01629-RGA-JLH
                                      )
                                      )
                                      )
LYFT, INC.,                           )
                                      )
Defendant.                            )
                                      )
_____   )

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

R. Karl Hill (DE2747)
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-7604
khill@svglaw.com

Of Counsel:

Michael J. Kasdan, Esq.
Joseph M. Casino, Esq.
Wiggin and Dana LLP
437 Madison Avenue – 35th Floor
New York, New York 10022

Attorneys for Plaintiff

February 23, 2021

# TABLE OF CONTENTS

I.    Nature and Stage of the Proceedings ........................................................... 1

II.   Summary of the Argument ........................................................................... 1

III.  Factual Background ..................................................................................... 2

IV.   Argument .................................................................................................... 4

   A.   The RSDI Patents are Patent-Eligible Inventions ................................... 4

      1.   Legal Standard for Patent Eligibility ............................................. 5

      2.   Lyft Declared to the USPTO that the Same Invention was Patent Eligible ...... 5

      3.   Alice Step One – The Claims are Not an Abstract Idea ..................... 7

      4.   Alice Step Two – The Claims have Inventive Elements ................... 14

   B.   Lyft's Control Over Use of the Accused Products is Sufficiently Plead ........... 18

V.    Conclusion ................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v Limelight Networks, Inc.*,
   797 F.3d 1020 (Fed. Cir. 2015) (*en banc*) ........................................................................19

*Alice Corp. v. CLS Bank International*,
   573 U.S. 208 (2014) ......................................................................................................5, 6, 7

*Align Tech., Inc. v. 3shape*,
   339 F. Supp. 3d 435 (D. Del. 2018) ...................................................................................19

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016) ....................................................................................17, 18

*Axcess Int'l, Inc. v. Genetec (USA) Inc.*,
   375 F. Supp. 3d 533 (D. Del. 2019) ...................................................................................12

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ......................................................................................9, 16

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ..............................................................................14, 15, 16

*Concaten, Inc. v. Ameritrak Fleet Sols.*,
   131 F. Supp. 3d 1166 (D. Colo. 2015) ...............................................................................13

*Content Extraction and Transmission LLC v. Wells Fargo Bank Nat'l Ass'n*,
   776 F.3d 1343 (Fed. Cir. 2014) ..........................................................................................18

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) ......................................................................................9, 17

*EcoServs., LLC v. Certified Aviation Servs., LLC*,
   830 F. App'x 634 (Fed. Cir. 2020) .....................................................................................11

*Elec. Power Grp., LLC v. Alstom S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ..........................................................................................18

*Guada Techs. LLC v. Vice Media, LLC*,
   341 F. Supp. 3d 390 (D. Del. 2018) ...................................................................................15

*Immersion Corp. v. Fitbit, Inc.*,
   2018 WL 1156979 (N.D. Cal. Mar. 5, 2018) .....................................................................14

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)..................................................................................9

*Ironworks Patents, LLC v. Apple Inc.*,
    No. CV 17-1399-RGA, 2018 WL 2944475 (D. Del. June 12, 2018) .....................14

*MacroPoint, LLC v. FourKites, Inc.*,
    No. 1:15 CV 1002, 2015 WL 6870118 (N.D. Ohio Nov. 6, 2015) .........................13

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012)...........................................................................................10

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)................................................................9, 10, 11, 12

*O'Reilly v. Morse*,
    56 U.S. 62, 64 (1854)...............................................................................................7

*Pragmatus Telecom, LLC v. Genesys Telecommunications Labs., Inc.*,
    114 F. Supp. 3d 192 (D. Del. 2015)...........................................................................9

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017).................................................................................13

*Sound View Innovations, LLC v. Delta Air Lines, Inc.*,
    No. CV 19-659-CFC, 2020 WL 1667239 (D. Del. Apr. 3, 2020) ..........................15

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1378 (Fed. Cir. 2019)................................................................................13

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019)................................................................................13

**Statutes**

35 U.S.C. § 101 (2018) ................................................................................................7, 14

Sami's Law ......................................................................................................................3

**Other Authorities**

37 C.F.R. §1.64 (2012) ....................................................................................................6

Anthony Fuga, *RPX: The Berkheimer/Aatrix Effect is Real*, JD Surpa (Jul. 16,
    2019) https://www.jdsupra.com/legalnews/rpx-the-berkheimer-aatrix-effect-
    is-real-17680/ ........................................................................................................14

Andrew A. Toole & Nicholas A Pairolero, Adjusting to Alice: USPTO Paten
    Examination outcomes after Alice Corp v. CLS Bank International No.3,
    2020...................................................................................................................................14

# I.     NATURE AND STAGE OF THE PROCEEDINGS

RideShare Displays, Inc. ("RSDI") adopts the shorthand definitions from Lyft, Inc's

("Lyft") Opening Brief in Support of its Motion to Dismiss ("MTD").

# II.    SUMMARY OF THE ARGUMENT

In its nascent stages, the rideshare industry focused on technical development, expansion

into new markets, and acquisition of new riders and drivers. Rideshare was met with enthusiasm

due to cheaper rides, jobs, and increased mobility. Unfortunately, the blossoming rideshare

industry had a darker side, as companies struggled to ensure passenger and driver safety. This

came to a head in 2019, when a spate of news articles and industry reports catalogued assaults,

sex crimes, and even murders of rideshare passengers and drivers. In one nationally reported

incident, young Samantha Josephson lost her life after she got into the wrong car.

RSDI recognized not only these dangers, but also the complexity and problems of

matching drivers and passengers with the huge volume of riders, vehicles, drivers, and locations.

It therefore developed a series of innovations —the Patents-in-Suit—that provided systems of

connecting drivers and passengers through signals from a separate controller.[1] The inventions

claim a specific system by which both the passenger and driver get a unique signal that they can

match to ensure the correct  passenger gets in the correct vehicle with the correct driver. For

example, a woman waiting in the rain at the Amtrak Station in Wilmington would see her phone

light orange, which she matches to the orange display visible from outside the intended car. If the

car doesn't display that orange signal, she knows not to get in that car. She has the assurance that

---

[1] The Patents-in-Suit include five patents: (1) U.S. Patent No. 9,892,637 ("the '637 Patent"), titled "Vehicle Identification System"; (2) U.S. Patent No. 10,169,987 ("the '987 Patent"), titled "Vehicle Identification System"; (3) U.S. Patent No. 10,395,525 ("the '525 Patent"), titled "Vehicle Identification System"; and (4) U.S. Patent No. 10,559,199 ("the '199 Patent"), titled "Vehicle Identification method; and (5) U.S. Patent No. 10,748,417 ("the '417 Patent"), titled "Vehicle Identification System."

she is in the right car and the driver can confirm he has the right passenger.

RSDI wasn't the only one to recognize the need for this invention. Two years later Lyft filed its own patent applications for an identical invention, telling the U.S. Patent and Trademark Office (USPTO) that such an invention was not only patent eligible and attesting that the invention was not abstract or conventional, but failing to cite RDSI's patents despite awareness. It then developed a real-world implementation of the invention—the Amp system—that infringes RSDI's Patents-in-Suit. Lyft ignored RDSI's patents, causing RDSI to file this lawsuit.

Lyft now argues that RSDI's Patents-in-Suit are an "abstract idea" that cannot be patented. This argument fails because (1) the Patents-in-Suit claim a tangible system to solve the safety problem in the rideshare industry, and (2) the Patents-in-Suit claim "something more" than an abstract idea because they are  an inventive solution that overcomes the safety and security problems with vehicle identification facing the rideshare industry. To this last point, the claims require the signals for the visual indicator come from a separate controller, which determines when the vehicle is within a pre-determined distance before sending the indicator.  Lyft's motion should also be denied because there are disputes of fact and Lyft is estopped because it made the opposite argument to the USPTO when it sought its own patent with similar claims.

Lyft then argues that the suit with respect to one of the patents--the '199 Patent—should be dismissed because other people also participate in the infringement. But RSDI has properly plead infringement because Lyft controls the timing and performance of all the steps.

## III.    FACTUAL BACKGROUND

Rideshare is a multi-billion-dollar industry that allows riders to use smartphones or other electronic devices to connect riders and drivers. (Compl. at ¶¶ 18, 23, 27). Safety became a key concern following the abduction and murder of Samantha Josephson, a 21-year-old college

student, whose assailant pretended to be her Uber driver. (*Id.* at ¶¶ 19, 41-59.) Other similar reports soon surfaced, prompting states to enact "Sami's Law," which required enhanced digital systems to verify the identities of both passengers and riders. (*Id.* at ¶¶ 47, 48). This went far beyond holding up a placard or wearing a rose in a lapel.

The industry needed new technology and RSDI delivered important, inventive solutions to these critical safety concerns in a series of five patents. The patented technology "provides passengers with the ability to immediately locate and securely identify the correct rideshare vehicle and driver." (Compl. ¶21). The patented technology operates by transmitting and displaying "a single-use identifier (e.g., a particular text string or color) that is simultaneously sent to both the driver's and passenger's cell phone/mobile device for each trip." *Id.* The claims recite specifically configured equipment rather than mere abstract matching of drivers and riders. For example, the claims include a non-abstract, specific arrangement of a controller, driver/rider mobile devices modified to interpret signals from the controller, and a wireless device that displays the indicators in a manner visible from a car's exterior.

RSDI announced its technology as a "unique" solution that solves "serious problems for rideshare companies and their customers as well as the owners/operators of ride share vehicles, due to 'an increase of reported misidentifications between passenger and vehicle, missed transactions, inconveniences, embarrassment and incorrect charges, and … more importantly, serious criminal activities associated with vehicle misidentification are on the rise as well.'" (Compl. ¶¶ 60-62). As a result, RSDI alleges each patent "solves a specific problem regarding safety by matching drivers and riders in an unique and previously unknown and nonconventional solution." (Compl. ¶¶ 172, 183, 194, 205, and 216).

Lyft now argues the Patents-in-Suit are abstract ideas that are ineligible for a patent, but

that has not always been Lyft's position. Indeed, Lyft sought and obtained a patent on identification features that mirror to the features in the Patents-in-Suit. (*See., e.g.*, Compl. ¶¶ 98-122; *See also* Ex. C, at 1.).[2] To obtain those patents, Lyft declared the USPTO that this technology *was* patent eligible and non-abstract. (Compl. ¶¶ 98-122; *See* Ex B, at 1). Unsurprisingly, Lyft itself testified before public authorities that its infringing products are a significant solution to the safety problem faced by riders and drivers. (Compl. ¶ 59).

Lyft's system infringes the Patents-in-Suit, including a controller, a rider's app, and a driver's app as a conduit to its the Amp device to display the indicator. These are specific components in the claims of the Patents-in-Suit. The Amp component shows that the claims are not merely abstract—Lyft uses special equipment. Lyft directs and controls the use of each component. (*See, e.g.*, Compl. ¶¶ 23, 39, 123-125, 130, 138, 144, 160 and 165).

## IV.   ARGUMENT

### A.   *The RSDI Patents are Patent-Eligible Inventions*

RSDI's Patents-in-Suit provide vital, innovative, and concrete inventive solutions for protecting the rideshare community. The patents solve a multitude of problems for both the passengers and drivers alike. Passengers can easily and securely identify their correctly matched vehicle as well as the assigned and previously vetted driver.  This eliminates the danger posed by impostor drivers who display fake signs and pretend to be the actual driver. It also eliminates many problems associated with license plates when used as identifiers— many states lack front license plates, riders have difficulty remembering, seeing and reading license plates, plates look-alike, line of sight issues, weather conditions etc. The RSDI patents allow the driver to securely identify their passenger as well.  Not just a mere substitute for human activity, the RSDI patents

---

[2] The Exhibits B, C and D are based on public USPTO information relating to patents cited in the Complaint. Exhibit A is a mark-up of Lyft's Exhibit A.

also eliminate the problems associated with voice and speech impediments, hearing and language issues between billions of riders and millions of drivers. Among other things, the claimed invention simultaneously sends a signal to be is displayed as an identifier to both the driver and the rider to ensure each can authenticate each other. Even though Lyft patented nearly identical technology, it now urges dismissal because the idea is too abstract and conventional.

    *1.    Legal Standard for Patent Eligibility*

Lyft contends that the RDSI patents are directed to abstract ideas without more. *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), established a two-part test to determine whether a claim is to an abstract idea. First, a court must determine whether the claim is directed to an abstract idea *per se*. Second, if the concept is abstract, the court must determine whether the claim's elements, considered both individually and as an ordered combination, transform the nature of the claims into a patent-eligible application.

Lyft moves for dismissal under this standard, but its arguments fail for three reasons: 1) Lyft made the opposite argument to the USPTO to obtain an identical invention; 2) Lyft misapplies *Alice*; and 3) factual disputes exist as to whether the technology is conventional.

    *2.    Lyft Declared to the USPTO that the Same Invention was Patent Eligible*

Lyft is estopped from making its argument because it affirmed to the USPTO that an identical invention *was* patent eligible. Lyft's '417 Application—issued in its '108 Patent—claims an invention identical to what Lyft now contends is abstract and patent ineligible. (Compl. ¶¶ 98-122; Ex. D (comparison of Lyft's and RSDI's claims)). Judicial estoppel applies when a party convinces a tribunal to adopt a position and then takes a clearly contradictory position. *See, e.g., New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)(estoppel does not have rigid rules but stems from successful pursuit of an argument to the detriment of another party). "The judicial estoppel doctrine also applies to administrative proceedings in which a party obtains a favorable

order by making an argument that it seeks to repudiate in a subsequent judicial proceeding."

*Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir.1993).

Lyft proclaimed to the USPTO that its application passed the two-part *Alice* test. For Step

One—whether the concept itself is patent ineligible—Lyft expressly argued sending the same

identifier was not "abstract" and rideshare created "new and unique problems for providing

services at a point of service." (Ex. B, at 15). It told the USPTO that:

> a process — to 'select[] an identification element from one or more available
> identification elements based on the estimated arrival time' and to 'send[] the
> identification element to the requestor computing device and the provider
> computing device, the identification element enabling dynamic presentation of
> information via a user interface of each of the requestor computing device and the
> provider computing device' — *is not abstract, mental, or manual*…. Similar to
> *DDR Holdings*, independent claim 1 of the present application addresses the
> computer and network-specific challenge of accurately and efficiently locating
> riders at a point of service through a distributed, on demand ride matching system.
> *Dynamic, on demand matching systems create new and unique problems* for
> providing services at a point of service."

(Ex. B, at 15) (emphasis added). Lyft now argues that the claims of the Patents-in-Suit

are a mere "abstract idea of identifying a particular vehicle with visual indicators, using

well-known technology that fails to incorporate inventive concepts. The claims seek to

patent the long-known process of using a visual indicator, such as a sign or digital display

to direct a passenger to a vehicle, such as a taxi or airport car service, using conventional

technologies." (MTD,  1). That's precisely the opposite of what it told the USPTO under

oath. *See* 37 C.F.R. § 1.64 (2012)(oath requirement).

As for Alice Step Two—whether the claim elements transform an otherwise ineligible

concept into a patentable claim—Lyft affirmed to the USPTO: "More accurate and specific

matching of providers and requestors provides advantages over previous systems. This ordered

combination of steps … is not well-known, routine, or conventional and arises from the unique

problems being faced by network connected providers and requestors connected through a matching system." (Ex. B at 20). Lyft now takes the opposite position of what it told the USPTO under oath, arguing that the Patents-in-Suit "claims seek to patent the long-known process of using a visual indicator, such as a sign or digital display to direct a passenger to a vehicle, such as a taxi or airport car service, using conventional technologies." (MTD, 1).

Lyft's positions before the USPTO obtained a patent but now it seeks to extinguish RDSI earlier patents for the same invention by taking an opposition position. The Court should not tolerate such blatant hypocrisy. The USPTO This is grounds for denying the motion and shows that there are disputes that are too highly factual to decide now.

3.      *Alice Step One – The Claims are Not an Abstract Idea*

*Alice* Step One requires the court to determine if the inventive concept is an abstract idea. The abstract idea exception prevents patenting a result where "it matters not by what process or machinery the result is accomplished." *O'Reilly v. Morse*, 56 U.S. 62, 65 (1854). A preemption concern arises when the claims are not directed to a specific invention and instead improperly monopolize "the basic tools of scientific and technological work." *Alice*, 573 U.S.. at 216(quoting *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013)).

Lyft's pitches the claims as being to the abstract ideas of correctly matching riders and drivers with visual indicators.  (MTD, 2). Their Exhibit A color codes certain limitations to show the idea is implemented with generic technology. *See generally* Ex. A. However, the claims are not to the abstract idea of correctly matching, but to how a specific system solves that idea using separate controller, the rider's mobile phone, the driver's mobile phone, a display visible from the exterior of a car and determine the proximity to the pick-up spot. As such, the unique configurations claimed are not abstract and do not preempt other solutions. Tellingly, the USPTO Examiners while rejecting Lyft's patents as ineligible, never rejected any of the more

7

specific RDSI Patents-in-Suit as patent ineligible in the five separate prosecutions.

a)      Lyft Fails to Analyze Key Distinctions in the Claims

Lyft argues that the claims in the Patents-in-Suit are all equivalent, standing and falling together under Section 101. In this way, Lyft tries to do an end run around many of the unique and key limitations contained in other claims of the Patents-in-Suit. Lyft instead ignores those key limitations, painting the claims in extremely broad brush to argue they are non-specific implementation of an abstract idea. Space limits cataloguing every example of how Lyft's lumping of claims goes awry. In Exhibit A, we highlight limitations ignored by Lyft that show how the claims are to non-abstract specific systems and will only repeat glaring examples below. But the fact remains that Lyft's decision to ignore these other limitations is fatal to its motion.

Claim 1 of the '987 Patent, includes at least two non-conventional and non-generic elements. It requires both "a controller communicatively coupled to the transceiver, wherein the controller is adapted to generate a first signal to be transmitted by the transceiver to a mobile communication device associated with a driver of the vehicle when it is determined that the vehicle is within a predetermined distance of a specific location…" (*See* MTD, 5). The first element, a controller that sends the driver a ride specific signal, is common to all claims of the patents. The second element— at a pre-determined distance is in Claim 1 of the '987 and '199 Patents but not in Claim 1 of the '637 Patent, '525 Patent or '417 Patent. Lyft also ignores other differences in the independent claims such as the signal received by the rider ('525 Patent), having a notification signal ('199 Patent), and requiring that there are no duplicates of the identification signal in the pick up area ('417 Patent). Assuredly, Lyft would not agree if RSDI proves infringement of one claim of a Patents-in-Suit, all claims are likewise infringed.

The dependent claims add other key differences such as where the signal is received (e.g.,

Claim 2 of the '637 Patent), the type of indicators (e.g., Claim 7 of the '987 Patent), or where the signals originate (e.g., Claim 3 of the '417 Patent). Rather than deal with these claim distinctions, Lyft focused on select common elements and argues they are conventional and generic. This over generalization of the claims shows exactly why a motion to dismiss is not the appropriate vehicle for determining whether the claims are conventional and generic, the well plead Amended Complaint asserts otherwise. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016)(warning against over generalization of claims).

Lyft has failed to show that any one claim is representative of the other claims of the Patents-in-Suit. A conclusory recitation of some common elements among the claims is no substitute for a review of whether the claims include meaningful differences. *See Pragmatus Telecom, LLC v. Genesys Telecommunications Labs., Inc.*, 114 F. Supp. 3d 192, 199 (D. Del. 2015). The deficiency of ignoring limitations is fatal to Lyft's motion because they show how the claims solve for the issue of safety with a specific system, which is different in each claim.

b)   The Claims Provide Tangible Solution To a Rideshare Problem

But even focusing on the claims that Lyft does address shows that the Patents-in-Suit are not claiming an abstract idea. Lyft contends that the Patents-in-Suit claim nothing more than the low-tech function of identifying a vehicle.[3] That is simply not the case and the invention more than adequately identifies "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

RDSI's patent claims are directed server control of matching the vehicle, driver and rider

---

[3] The "low tech" exception to patentability is not supported by the case cited by Lyft, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016). However, characterizing RDSI's invention as low tech is a red herring given Lyft's comparable patent filing. Further, the technology claimed in the RSDI patent is no simpler than the claims found to be non-abstract in the Federal Circuit *Bascom* or *DDR* cases.

in a specific way. (Compl. ¶¶ 38-39). As such, they include technical solutions that are not abstract. Lyft tries to circumvent this by asserting RSDI's invention is just abstract general computing technology. That's not the case. As discussed below, the Patents-in-Suit set forth a technical solution to a problem in the specific environment of ridesharing. Lyft understood this when it sought its '108 Patent (and its pending '253 application), and it is still true today.

The prevailing standards make eligibility clear. The Supreme Court recognized in the seminal *Mayo* case that "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). Step One should not be a linguistic contest where the alleged infringer provides a broad recitation of what the patents claim to support that they are abstract. "[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO*, 837 F.3d at 1313. The cotton gin could broadly be claimed as the abstract idea of separating the seeds from the cotton, but the focus must be on whether a specific way of doing so has been claimed. If the claims are to a specific machine for separating seeds, it is of no moment that this could be done by humans or that the machine consists of pre-existing parts.

There are several reasons why the Court should reject Lyft's contention that RSDI's patents cover general computing technology that embody the long-known use of visual indicators to match riders and passengers. Lyft's own patents note the problem is different for rideshare:

> [M]ultiple requestors may request services in the same area and may have trouble identifying whether a service provider is associated with their request or another request. Similarly, it can be difficult for a provider to identify which of multiple requestors is associated with a request. The mismatching of providers and requestors leads to increased data processing and system communications as requestors cancel requests, place new requests, and require account corrections. Furthermore, mismatched requestors and providers also lead to fraud and safety problems as mismatched requestors may obtain goods and services without

paying and the safety features of the system rely on the correct identification and matching of requestors and providers.

(USP 10,636,108 at Col. 2, ln. 50 *et seq*.). Lyft felt the problem was so significant and unique that it too filed for patents claiming a nearly identical system to RSDI's.

Moreover, the RSDI patents claim a specific system for matching riders, vehicles and drivers. Courts have found this more than adequate in similar situations. In *McRo,* for example, the Federal Circuit has found that claims for lip syncing technology were patent eligible at Step One. 837 F.3d at 1316. The *McRO* patents related to "computer software for use with a computer for the rapid, efficient lip synchronization and manipulation of character facial expressions, thereby allowing for rapid, creative, and expressive animation products to be produced in a very cost-effective manner." *Id.* at 1307. The Court held that "[b]y incorporating the specific features of the rules as claim limitations, claim 1 is limited to a specific process for automatically animating characters using particular information and techniques and does not preempt approaches that use rules of a different structure or different techniques." *Id.* at 1316.

Similarly, the Patents-in-Suit require that the vehicle indicators come from a separate controller and several patents also require that the indicator be sent when the driver and rider are at a predetermined distance. These specific requirements elevate these claims above mere abstract idea. Sending the indicator from the central controller ensures that both the rider and the driver receive the signal, reducing the chance of misidentification. The driver and rider match indicators to ensure the right passenger gets in the right car. This is safer for everybody involved.

c)   The Claims Require More than Human activity

Lyft next argues that the RSDI patents are abstract because they are just computerizing human activity. That is not the case. Some inventions that "automate tasks that humans are capable of performing are patent eligible if properly claimed[.]" *McRO*, 837 F.3d at 1313; *see*

11

also, e.g., *EcoServs., LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634, 643 (Fed. Cir. 2020) ("That the claimed system achieves automation of a task previously performed by humans, however, does not mean the claimed system is necessarily directed to an abstract idea."). In *McRO*, the patent eligible claims were focused on a "specific asserted improvement" in computer animation and there was "no evidence that the process previously used by animators is the same as the process required by the claims." 837 F.3d at 1303, 1314; *see also, e.g., Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533, 537 (D. Del. 2019) ("Methods with real-world impact, implemented on physical devices, are not rendered abstract merely by the ability of a human to achieve a similar result (e.g. keeping watch) via different means.").

Lyft's contrary argument makes no sense—humans can't detect the positions of vehicles, nor can drivers display a unique identifier to a rider, nor can a rider display the same unique identifier to the driver. (*See, e.g.,* Claim 1 of the '987 and '199 Patents). Just as the cotton gin is an improved machine for separating seeds—a task humans can do—the claims here are improved equipment for safely matching drivers and riders. Improvements here include that it displays the indicator to both the rider and driver on their phone. Humans can't pass indicators in this way—a fake driver could forge a placard or wear a rose—whereas the Patent-in-Suit give both parties a way to identify the other for each ride. For example, if a dispatcher gives a car number to the driver and rider, the driver has a pre-made sign with the number in his car (not a display panel easily seen from outside the car). A pre-made sign is not unique to the ride and requires no thought or verification by the driver. However, if the indicator is unique to the ride and sent to both the driver and rider (*See* Claim 1 of the '525 Patent), then the rider and driver have to verify their match. Further, the idea of meeting a romantic partner by wearing a colored scarf doesn't work if three people in the restaurant have scarfs of the same color.

If human activity were enough, Lyft would not have sought its '108 Patent. It instead would have its drivers wear a different brightly colored scarf for each passenger. To state the obvious, that's absurd and that's why the Patents-in-Suit exist.

> d)   Lyft's "Analogous" Cases are Not on Point

Lyft relies on *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905 (Fed. Cir. 2017). There, claims to using a marking on the outside of a mail object were found ineligible. However, the Federal Circuit found it critical that the claims were "not limited to any particular technology" but rather "each step of the process is directed to the abstract process of communicating information about a mail object using a personalized marking." *Id* at 911. That is substantially different than the present case, where RSDI's patents all require particular equipment such as a separate controller. Further, other claims require this at a predetermined distance from the rider. The claims are not just to the idea of matching drivers and riders, but to how to match them in the rideshare technical environment.[4]

*Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1381 (Fed. Cir. 2019), is also irrelevant. There the claims were to providing a trader with additional financial information to facilitate market trades, *i.e.*, an abstract idea, detached from any implementation. *Id.* Lyft argues that "the asserted patents, like those in *Trading Tech.*, are directed to providing information (a visual indicator) to riders to help them more efficiently identify a particular vehicle." (MTD, 7). However, the visual indicator is not what is the distinction from an abstract idea but the elements that require the separate server send the information to the driver and rider and determining the

---

[4] The supporting cases likewise fail. *MacroPoint, LLC v. FourKites, Inc.*, No. 1:15 CV 1002, 2015 WL 6870118, at *1, *5 (N.D. Ohio Nov. 6, 2015) (finding "plaintiff's proposed technological improvement is lacking in the claim language itself.") *Concaten, Inc. v. Ameritrak Fleet Sols.*, 131 F. Supp. 3d 1166, 1170 (D. Colo. 2015) (pre-*Berkheimer* case finding that claims did not include any inventive elements or non-generic technology).

proximity to the pick-up spot, which are specific implementation details in the claims.[5]

More on point, this Court has consistently found claims to tangible systems to be patent eligible. *Ironworks Patents, LLC v. Apple Inc.*, No. CV 17-1399-RGA, 2018 WL 2944475, at *3 (D. Del. June 12, 2018); *see also Immersion Corp. v. Fitbit, Inc.*, 2018 WL 1156979, at *14 (N.D. Cal. Mar. 5, 2018) ("other district courts ... have rejected § 101 challenges where the claims are directed to a physical device that merely incorporates an abstract idea as part of its operation"). *Ironworks* involved claims directed to tangible systems—a "portable device" and a "mobile station," including "specific components that are configured to perform specific functions in response to specific events." *Id.* As such, the claims did not preempt all claims that use vibration or vocabulary to convey information. Here, the claims are directed to a specific way of securely matching drivers and passengers using unique identifiers, central controllers, a display visible from outside the vehicle and proximity to the pickup location.

    4.    *Alice Step Two – The Claims have Inventive Elements*

    a)    <u>Lyft's Motion Is Premature under Berkheimer and its Progeny.</u>

Lyft's motion is premature under *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).[6] In that case, the Federal Circuit established the test for determining whether a claimed technology is conventional and therefore patent ineligible. *Id.* The court explained that "the question of whether a claim element or combination of elements is well-understood, routine and

---

[5] Finally, *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019), is off too. There, the patent-at-issue admitted that was just computerizing a pen and paper method to make it faster and that used generic components without any inventive concept. Here, the claims have elements that show a specific implementation that requires the indicators displayed by the driver and sent to the rider to come from a central controller as well as additional elements in the '987 and '199 Patents related to determining when the driver is near the pick-up area.

[6] It's widely recognized that after *Berkheimer* patent applicants have fared better in the USPTO on 35 U.S.C. § 101 and motions to dismiss for patent eligibility are more often denied. (https://www.jdsupra.com/legalnews/rpx-the-berkheimer-aatrix-effect-is-real-17680/ and https://www.uspto.gov/sites/default/files/documents/OCE-DH_AdjustingtoAlice.pdf at pg. 5.

conventional to a skilled artisan in the relevant field is a question of fact. Any fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Id.* Applying that standard, the Federal Circuit found it inappropriate even at summary judgment to resolve a dispute between the parties as to whether the technology disclosed and claimed was conventional, routine and generic. *Id.*

This Court recognizes that the reasoning of *Berkheimer* applies with even greater force at the pleading stage. In *Sound View Innovations, LLC v. Delta Air Lines, Inc.*, No. CV 19-659-CFC, 2020 WL 1667239, at *1 (D. Del. Apr. 3, 2020), the Court said that it need not and "does not decide whether the asserted patents are directed to abstract ideas because statements in the specifications of the asserted patents that are alleged or incorporated by reference in the complaints plausibly establish that the asserted claims contain an inventive concept." *Id.* at *2. The Court held that it was a genuine issue of material fact whether a skilled artisan would think the claims perform conventional activities, preventing dismissal at the pleading stage. *Id* at 6; *see also Guada Techs. LLC v. Vice Media, LLC*, 341 F. Supp. 3d 390, 399–400 (D. Del. 2018).

Dismissal would be particularly inappropriate in this case because the Complaint—on its face—alleges each of the Patents-in-Suit "solves a specific problem regarding safety by matching drivers and riders in a unique and previously unknown and non-conventional solution." (Compl. ¶¶ 172, 183, 194, 199, and 216). This is not a conclusory allegation. The Patents-in-Suit have inventive elements including claimed distinctions such as using a controller to send a unique identification signal to both the rider's mobile device and to the drivers device that is also a conduit to a communicatively coupled display for presenting the unique identifier to the driver and rider and doing so when the vehicle and passenger near the pickup area. *See* Section IV.A.3.a, *supra*. Lyft ignores these inventive limitations.

15

Figure 2 shows the technological environment for the patented inventions, which illustrates the tangible system using a controller or server sending signals to the driver and rider's mobile phones which equipment is embodied in the claims:



This is one example showing that it is disputed whether the claims are unconventional. This is neither the time nor place to resolve those disputes under *Berkheimer* and its progeny.

        b)      <u>There is "Something More" to the RSDI Patents</u>

If the Court reaches the merits of Step Two—which it should not— the Federal Circuit's reasoning in *Bascom* requires denying the motion. In *Bascom*, the patents involved blocking internet websites using a blacklist of inappropriate websites where the inventive element was that the list was housed on a remote server instead of individual computers. 827 F.3d at 1343. The Defendant said it was patent ineligible because it was the same as "a parent or librarian forbidding children from reading certain books, and argued that performing the filtering on the Internet does not make the idea nonabstract." *Id.* at 1346. The Federal Circuit rejected that argument, holding that the patentee adequately stated "an inventive concept can be found in the ordered combination of claim limitations that transform the abstract idea of filtering content into a particular, practical application of that abstract idea." 827 F.3d at 1352.

Here, the patents use an identifier sent by a separate controller. This means that both the rider and driver need to reply to a challenge, *i.e.*, matching the identifier. (Compl. ¶ 231). Further, the system monitors the driver's location so that identifier/indicator only displays when the driver is at a pre-determined distance to the rider. That is innovative and avoids driver distraction. These are concrete claimed improvements over the prior art, just as moving the block list to the server from the PC in Bascom supported that the invention there was patent eligible.

The Federal Circuit's decision in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014), further supports patent eligibility. There, the Federal Circuit held that the patent claimed a technical solution to a problem unique to the Internet—websites losing views when a viewer clicked a link to another company's website. *Id.* at 1248–50. The claimed invention solved that problem in a technical way by sending the viewer to a hybrid webpage that combined visual elements of the first website with the desired content from the second website. *Id.* at 1257–59. This hybrid webpage was a technical solution that was more than an abstract claim for all implementations for retaining web viewers.

Here, the claims provide a technical solution to a problem that exists in rideshare industry, *i.e.*, quick and safe matching of riders and drivers using rideshare technology. The claims do this by having a separate controller send the indicator to both the rider and driver, enabling a visual match. Lyft liked this idea so much that it sought expedited patent protection.

c)   Lyft's "Analogous" Cases are Not on Point

Lyft relies on several cases, but none are relevant. For example, in *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229 (Fed. Cir. 2016), the Federal Circuit found:

> The patents claim systems including menus with particular features. They do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems. *Id.* Essentially, the claims are directed to certain functionality—here, the ability to

17

> generate menus with certain features. Alternatively, the claims are not directed to
> a specific improvement in the way computers operate.

*Id.* at 1241. The patents claim how to match a rider, vehicle, and driver, not just the function of

matching. The indicators must come from a separate controller. Other claims, as noted, require

that the indicators be sent when the driver is in the pickup area.

Next, Lyft relies on *Content Extraction and Transmission LLC v. Wells Fargo Bank Nat'l*

*Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014), for the proposition that a well-known solution is

not enough to make a claim patent eligible. However, Lyft's '108 Patent, admits that the

solutions to matching drivers and riders in a rideshare environment are not well-known. (*See*

'108 Patent, Col. 3, ln. 4-15)(describing problems). RSDI's and Lyft's patents show that the

solutions to this problem had to be developed and were not well known. Finally, Lyft cites *Elec.*

*Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), for the proposition that "the

claims do not require any nonconventional computer, network, or communication components,

or a non-conventional arrangement of them." (MTD,11). However, here the claims do require

specific configurations that solve the problem of how best to match the vehicle, driver and the

rider—sending a unique indicator to the driver's device which is coupled to a wirelessly enabled

display, and also to the rider from a separate controller.

### B.      *Lyft's Control Over Use of the Accused Products is Sufficiently Plead*

Lyft then moves to dismiss the method claims of the '199 Patent, but it ignores the

pleading. Lyft acknowledges that infringement of a method claims when there are multiple actors

is sufficient if "[a] plaintiff can sufficiently plead that a defendant directs or controls another's

performance of the claimed method if it demonstrates that the defendant: (1) conditions

participation in an activity or receipt of a benefit upon others performance of one or more steps

of the patented method; and (2) establishes the manner or timing of that performance." (MTD,

19; internal quotations and citations omitted). This is exactly what was plead:

> Defendant, Lyft, controls a ride sharing platform that uses apps ("the Lyft App(s)") to connect passengers requesting rides with drivers who have vehicles. Both the passenger and driver operate Lyft Apps, which are designed and controlled by Lyft. Lyft conditions participation in its ride sharing network by performance of a step or steps of a patented method and establishes the manner or timing of that performance for drivers and passengers.

(Compl. ¶ 23). This is *haec verba* what the CAFC requires. *Akamai Techs., Inc. v Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (*en banc*). "To require anything more at this stage of the case would require the equivalent of infringement contentions, which is more than the law demands" *Align Tech., Inc. v. 3shape*, 339 F. Supp. 3d 435, 446 (D. Del. 2018).

Further, Lyft has no basis to say the infringement allegations are "unadorned" or "threadbare." (MTD,18). The Complaint lays out the claims are infringed by the combination of components of the Accused Product. (Compl. ¶ 123). The Complaint alleges: "All components of the Accused Products are made by and for Lyft; the Lyft Apps are distributed by Lyft; the Accused Products are used under the control and direction of Lyft; and Lyft benefits from the use of each and every component of the Accused Products. Lyft conditions participation in its ride sharing network upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Id.* The next six paragraphs of the Complaint detail how each component is designed by or for and used under the control of Lyft. The Complaint specifies that the riders and driver's actions are governed by Lyft's terms of service (Compl. ¶¶ 34, 126-27) and "Lyft completely controls the actions of the drivers and passengers to use Accused Products for ride-hailing" (Compl. ¶ 130).

Lyft includes an annotated copy of Claim 1 of the '199 that shows that it understands that RSDI's allegations are that multiple actors perform the method of claim 1. (MTD, at 18). However, Lyft ignores its mandated terms of service and the pleading that Lyft "conditions

participation in its ride sharing network by performance of a step or steps of a patented method and establishes the manner or timing of that performance for drivers and passengers." (Compl. ¶ 23; *see also* ¶¶ 123, 127 and 220).

Lyft argues it is not clear who performs "identifying the vehicle based on appearance of a match, by the visual observation of the user." (MTD, at 19). It also contends that the Complaint does not "sufficiently" allege (MTD,20) that this step is performed by the same entity as other steps. As to the first point, the claim itself says the identification is done by visual observation of the "user" who is clearly the rider in the claim. More importantly, the Complaint is clear that the method steps are not performed by one entity, but instead alleges that they are performed by multiple entities under the direction and control of Lyft, which directs the rider and driver's use.

Finally, Lyft implies it does not infringe the method claims because riders may choose to ignore the indicators displayed on the vehicle. Lyft contends the Complaint "does not and cannot allege that Lyft requires riders to visually observe indicators displayed on vehicles and on rider devices to identify a match." (MTD, 20). The Complaint, however, alleges that Lyft controls drivers and passenger's behaviors through its products and contractually required terms of service. (Compl. ¶¶ 34, 126-27, 130). Lyft agrees that the Amp controls rider behavior: "By ensuring a vehicle's Amp is displaying the same color indicated in their app, riders can further confirm they are entering the vehicle with which they were matched." (Compl. at ¶ 59).

## V.   CONCLUSION

For the reasons set forth in this Opposition, Lyft's Motion to Dismiss should be denied.

Dated: February 23, 2021

/s/ R. Karl Hill
R. Karl Hill (DE2747)
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, DE 19899
(302) 888-7604
khill@svglaw.com

Of Counsel:

Michael J. Kasdan, Esq.
Joseph M. Casino, Esq.
Wiggin and Dana LLP
437 Madison Avenue – 35th Floor
New York, New York 10022
29606\1\4837-9221-3981.v1